FILED

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2022 NOV 21  PM 1:47

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| JOSHUA CACHO, | §<br>§<br>§ |
| Plaintiff, | §<br>§<br>§ |
| v. | §<br>§ |
| EGV COMPANIES, INC. d/b/a's OMEGA<br>AUTO CARE, VANGUARD VEHICLE<br>ARMOR, GOLD STAR PROTECTION, and<br>AUTO SERVICE DEPOT a Delaware<br>Corporation | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |
| | §<br>§ |
| Defendant | §<br>§<br>§ |

6:22-CV-02167-WWB-DCI

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1. The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle

District of Florida, and was present in Florida for all calls, in this case in Seminole County,

Florida.

2. Defendant EGV COMPANIES, INC. ("EGV") is a Delaware Corporation organized and

existing under the laws of Florida with its principal address at 50 N Laura St. Suite 2500

Jacksonville, Fl 32203, and can be served via registered agent C T COPORATION SYSTEM at

1200 South Pine Island Road Plantation, Fl 33324.

3. Defendant EGV COMPANIES, INC. hereinafter will be referred to as "Defendant"

and/or "EGV".

1

## JURISDICTION AND VENUE

4.    Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

5.    This Court has general personal jurisdiction over the Defendant because they have

repeatedly placed calls to Florida residents, and derived revenue from Florida residents, and they

sell goods and services to Florida residents, including the Plaintiff.

6.    Defendant maintains sufficient minimum contacts with this District, have purposefully

availed themselves of the privilege of doing business in this District, maintain registered agents

in Florida, and possess such significant and continuous presence in this District such as to be

subject to the personal jurisdiction of this Court.

## VENUE

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the calls and sale of goods and services

directed at Florida residents, including the Plaintiff—occurred in this District and because the

Plaintiff resides in this District.

8.    This Court has venue over Defendant because the calls at issue were sent by or on behalf

of the above-named Defendant to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

### OF 1991, 47 U.S.C. § 227

9.    In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

15.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.  .   The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

4

946, 951 – 52 (9th Cir. 2009).

21.     The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential umber generator; and (B) to dial such numbers. *Id.* at § 227(a)(1)

22.     As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal Communication Commission ("FCC") the responsibility to promulgate regulations implementing the TCPA's requirements. *Id.* at § 227(a)(1).

23.     Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a "predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[1]

24.     In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

25.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal

participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D.

Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability,

the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

26. Plaintiff's personal cell phone (407) 577-3822 ("3822") has been registered on the

National Do-Not-Call Registry for more than 31 days prior to first phone call from Defendant

EGV.

27. Plaintiff never asked the National Do-Not-Call Registry administrator to remove him

from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry

at all times relevant to this Complaint.

28. Defendant EGV is the administrator for vehicle service contracts and works with multiple

insurance companies. See exhibit A

29. Defendant EGV who operates under the aliases of "OMEGA AUTO CARE",

"VANGUARD VEHILE ARMOR", and "GOLD STANDARD PROTECTION" owns and

operates the websites www.vanguardvehiclearmor.com, www.omegaautocare.com,

www.goldstandardprotection.com, and www.autoservicedepot.co.

30. As part of its marketing Defendant EGV hires and authorizes telemarketers to make

unauthorized phone calls to consumers *en masse* using a "predictive dialer" which is an

automatic telephone dialing system ("ATDS") to solicit personal home and auto warranty

policies on behalf of Defendant EGV.

31. Defendant EGV approves of the contracts with these telemarketers.

32. Defendant EGV pays the telemarketers out of bank accounts they own and control.

6

33.    Defendant EGV is well aware the telemarketers they hire to solicit on their behalf are violating the TCPA by making unauthorized phone calls to consumers using an ATDS.

34.    Defendant EGV has been sued many times prior to Plaintiff filing this lawsuit for violating multiple laws including TCPA, examples but not limited to are, *Hood v. American Auto Care, LLC et al, No. 1:2018cv02807 (D.CO., Nov. 02,2018) Hirsch v. Fortega Financial Corporation et al, No. 3:2017cv01215 (M.D.FL., Oct. 30, 2017), Paragon Partners, Inc. v. EFS Companies, LLC et al, No. 4:2020cv01069 (E.D.MO., Aug 13,2020), Henderson v. Lyndon Southern Insurance Company et al, No. 4:2021cv01170 (N.D.OK., Oct. 29,2021), Cunningham v. JP3 Enterprises, LLC DBA My Vehicle Protection et al, No.4:2019cv00902 (E.D.TX., Dec. 21,2020), Brown v. EGV Companies, Inc., No. 8:2022cv01382 (E.D.MO., June 17, 2022), Miller v. EGV Companies, Inc., No. 5:2020cv00690 (N.D.OH., Apr. 01, 2020), Smith v. EGV Companies, Inc., No. 2:2019cv01170 (E.D.PA., March 19, 2019), Gresham V. EGV Companies Inc., No. 5:2020cv01442 (E.D.TX., Dec. 21, 2020), Salaiz v. EGV Companies; Inc., No. 3:2021cv00208 (W.D.TX. Sept. 07, 2021)* and continues their illegal behavior because violating the TCPA benefits them financially.

35.    Each and every time Defendant EGV coerces a consumer into getting a auto or home warranty for vehicle(s) or home(s) they own or do not own, it benefits EGV financially.

36.    . The plaintiff has been harassed with ATDS calls from telemarketers calling on behalf of Defendant EGV for over a month.

37.    Plaintiff received at least fourteen (14) unauthorized phone calls to his personal cell phone 3822 from telemarketers calling on behalf of Defendant EGV using a predictive dialing system within a little over a month ("the calls"). The calls Plaintiff received from or on behalf of Defendant EGV solicited Plaintiff for auto warranty coverage.

38.     With information and belief, Plaintiff has received more phone calls from or on behalf of Defendant EGV within the past two years that are unknown to Plaintiff at this time and will be revealed during discovery.

39.     On September 26, 2022, Plaintiff received a phone call to his personal cell phone 3822 from a telemarketer calling on behalf of Defendant EGV from phone number (352) 310-1937.

40.     Plaintiff answered "hello" and there was a 3-4 second delay followed by an audible beep (indicating the call was made using an ATDS) before being connected to a telemarketer by the name of "Nathan" calling on behalf of "warranty department".

41.     Defendant EGV's Telemarketer Nathan pitched an auto warranty policy to Plaintiff and then gathered personal, and vehicle information from Plaintiff and eventually transferred call to a "finance manager" by the name of "Henry".

42.     Henry then gathered more "qualifying" information from plaintiff and sold him a coverage which cost a total of $3692.00 with a $95 down payment and 24 monthly payments of $146.13 to follow.

43.     Henry stated he was a "finance manager" and his name was "Henry Hernandez" and claimed he worked for "OMEGA AUTO CARE" with a call back number of (888) 525-0760.

44.     Plaintiff was then charged $95.00 by "VANGUARD VEHICLE ARMOR" and received an email from them the next day confirming charge and policy agreement. *See exhibit B*

45.     Plaintiff received nine (9) more predictive dialer calls from same company. Plaintiff knows it was same company because they all followed the same beginning format and identified themselves by first name only and calling on behalf of "vehicle warranty department" or "warranty department"

46.     On ninth (9th) call (No. 10 call on log), October 11, 2022 Plaintiff was contacted by

8

number (321) 382-1025. After answering with "hello" there was a pause, and then a loud beep on the line before being connected to a telemarketer by the name of "Crystal".

47.    Plaintiff heard a lot of back ground noises followed by "Crystal" apparently speaking to a co worker as she was speaking what appeared to be Pakistani or Indian loudly directly into the phone. (which shows evidence this calls was not dialed manually, but instead the telemarketer waits until the system connects 1 of hundreds of calls it places at the same time). After plaintiff said "hello" loudly a few times she then got on the line and identified herself as "Crystal from car warranty department"

48.    Crystal then pitched plaintiff auto warranty coverage and gathered a bunch of personal and vehicle information.

49.    Eventually the call was transferred to "James a Toyota specialist". Plaintiff told them his vehicle was Toyota tundra and that's why he claims to be a Toyota specialist.

50.    Ironically Plaintiff does not own the Tundra he informed them about anymore, which shows they will sell this policy to anyone.

51.    The telemarketer James asked some more questions and eventually sold Plaintiff a policy for $2380.00 with a $95.00 down payment followed by 18 monthly payments in the amount of $123.89.

52.    Plaintiff received a couple of telemarketing calls from Defendant EGV before being called directly by "Raul" On September October 11, 2022 from phone number (949) 825-7264.

53.    Raul was connected with calls received from James and identified himself as a "finance manager". Raul went over everything with Plaintiff and sent him to website omegaautocare.com to look at coverage details.

54.    "Raul" then charged plaintiff $95.00 at his approval.

9

55.     Raul then sent Plaintiff an email comfirming charge and policy agrrement from

raul.abarca@goldstandardprotection.com *see exhibit B.*

56.     Plaintiff asked Raul why it showing Gold Standard Protection and not OMEGA. Raul's

response was "They pay out the claim and were the seller, were basically a broker and they're

the insurer".

57.     On November 01, 2022 at 7:36 PM Plaintiff received a new telemarketing call from

"Eddie at warranty department"

58.     Plaintiff immediately hung up

59.     On November 02, 2022 Plaintiff received a call from phone number (689) 588-3433.

After plaintiff answered with "hello" there was a long pause followed by audible beep and then

the call was transferred to "Roxy from vehicle service department" .

60.     Roxy gathered some qualifying information and Plaintiff was then transferred to a

gentlemen who never stated his name but identified himself as a "Toyota specialist in the

coverage department"

61.     Telemarketer then went over everything with plaintiff and told him the cost of the

coverage would be $3,231.96 with a $195 down payment that would be charged immediately,

followed by 24 monthly payments of $126.54.

62.     Defendant asked telemarketer if he could see everything in black and white before paying

and his response was "you'll receive everything in the mail" Plaintiff then requested an email or

website where he could see in print the outline for the coverage telemarketers response was "the

comfortability for both parties is a 30 day review, and nothing is sent out without a deposit".

63.     After agreeing to move forward Defendant EGV's telemarketer then transferred Plaintiff

to a "verification specialist" by the name of "Aaron Brown".

64.     Aaron then verified all info and informed Plaintiff that he would be placing charge on his account during call.

65.     He also informed Plaintiff that he would continue to get "auto dialed calls, prerecorded messages, and or auto generated texts, and would not be able to be removed from the list for awhile "

66.     The above mentioned statement made by Defendant EGV's telemarketer further confirms all calls Plaintiff received had been placed using an ATDS.

67.     Defendant EGV's telemarketer informed Plaintiff that they were "customer service" for OMEGA AUTO CARE, Plaintiff then asked Aaron "but what's the name of YOUR company" he responded "Auto Service Depot which is the broker" and when asked about a website he said Plaintiff could just "google it".

68.     Defendant EGV trains their telemarketers to use aliases and fictitious names for both themselves and that of the company, as to protect Defendant EGV from TCPA violations.

69.     Defendant's telemarketer ended call by stating he would receive two (2) emails from OMEGA one same day and one following day. *See exhibit B.*

70.     On Nov. 03,2022 Plaintiff received a call from phone number (352) 209-6813. Plaintiff answered "hello" and after a few second delay in call and a loud audible beep was connected to a telemarketer "Josh Garcia from warranty department".

71.     Defendants EGV's telemarketer Josh began pitching new auto warranty coverage but the call was disconnected after he asked Plaintiff if he had received anything in the mail about their offer. Plaintiff responded "I think so" but Defendant's telemarketer couldn't here plaintiff and so he hung up.

72.     Plaintiff has received at least sixteen (16) calls that he is aware of, and only followed

through with warranty agreements three (3) separate times for the sole purpose of finding the companies responsible for making these calls which have greatly aggravated and continue to annoy him.

73.    Each and every phone call Plaintiff received from or on behalf of Defendant EGV is a telephone solicitation as defined by 47 U.S.C. § 227(a)(4) and solicited a auto warranty policy to Plaintiff on behalf of Defendant EGV.

74.    Plaintiff did not ask Defendant EGV to call him regarding auto warranty services.

75.    Plaintiff did not seek or solicit Defendant EGV phone calls or services in any way.

76.    Table A displays the calls made to Plaintiff from or on behalf of the Defendant EGV:

Table A

| No. | Date | Time | Caller ID | Notes |
|-----|------|------|-----------|-------|
| 1 | 09/26/2022 | 4:59 PM | (352) 310-1937 | Nathan from warranty department |
| 2 | 09/26/2022 | 6:05 PM | (640) 206-7853 | Ash from vehicle warranty department |
| 3 | 09/26/2022 | 6:49 PM | (401) 285-4594 | Alex from vehicle warranty department |
| 4 | 10/03/2022 | 2:50 PM | (407) 342- 4238 | John from warrant department |
| 5 | 10/05/2022 | 3:42 PM | (203) 628-4229 | Sam from warranty department |
| 6 | 10/06/2022 | 11:43 PM | (407) 439-7717 | Felix from car warranty department |
| 7 | 10/07/2022 | 12:56 PM | (754) 336-5246 | Marissa from car warranty department |
| 8 | 10/10/2022 | 5:27 PM | (844) 435-0779 | Andrea from auto warranty department |
| 9 | 10/11/2022 | 2:44 PM | (689) 214-7325 | Sofi from vehicle warranty department |
| 10 | 10/11/2022 | 3:09 PM | (3210 382-1025 | Crystal from vehicle warranty department |
| 11 | 10/11/2022 | 4:01 am | (949) 825-7264 | Telemarketer Raul voice mail |
| 12 | 10/11/2022 | 4:54 PM | (239) 306-6346 | James from car warranty department |

| 13 | 10/11/2022 | 5:36 PM | (949) 825-7264 | Telemarketer Raul from OMEGA AUTO CARE |
| 14 | 11/01/2022 | 7:36 PM | (386) 3488-084 | Eddie from warranty department |
| 15 | 11/01/2022 | 5:38 PM | (689) 588-3433 | Roxy from vehicle service department |
| 16 | 11/03/2022 | 7:03 PM | (352) 309-6813 | Josh Garcia from warranty department |

77.    Defendant's telemarketers initiated numerous unsolicited telephone calls and made unlawful telemarketing sales pitches to Plaintiff regarding auto warranty on behalf of Defendant EGV.

78.    No emergency necessitated any of the alleged phone calls.

79.    Plaintiff sent an internal do-not-call policy request to Defendant EGV to contactus@omegaautocare.com, customerservice@autopolicycenter.com, and customerservice@goldstandardprotection.com on November 02, 2022, which are emails listed on websites owned and operated by 'OMEGA AUTO CARE", "GOLD STANDARD PROTECTION", and "AUTO SERVICE DEPOT" which are d.b.a.'s for Defendant EGV.

80.    Upon information and belief, the Defendant did not have a written do-not-call policy while they were sending Plaintiff the calls.

81.    So Upon information and belief, the Defendant did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

82.    Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

83.    Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity, and inability to use phone for other personal use.

13

## VICARIOUS LIABILITY OF DEFENDANT EGV

84.     Defendant is vicariously liable for the telemarketing calls that generated the lead on their behalf.

85.     The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

86.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

87.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

88.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

14

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

89.     More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

90.     The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

91.     To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

92.     Vicarious liability is important because reputable, traceable, and solvent companies that

benefit from illegal telemarketing are "in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

93.     Defendant is legally responsible for ensuring that the affiliates that make telemarketing

calls on its behalf comply with the TCPA when so doing.

94.     Defendant knowingly and actively accepted business that originated through illegal

telemarketing.

95.     Defendant knew (or reasonably should have known) that its telemarketer were violating

the TCPA on their behalf but failed to take effective steps within their power to force the

telemarketer to cease that conduct.

96.     By hiring a company to make calls on their behalf, Defendant "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

97.     Moreover, Defendant maintained interim control over the actions of their telemarketers.

98.     For example, Defendant had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

99.     Furthermore, Defendant had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant and the ability to require them to respect the National Do Not Call Registry.

100.     Defendant also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

101.     Defendant donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched auto warranty policies in the abstract.

102.     Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

103.     "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

104.     A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

105.    Defendant's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant EGV. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

106.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

107.    Defendant is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for a auto warranty coverage on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

108.    Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

109.    Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

110.    Defendant's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

111.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and

more frequent charging of my cell phone.

## Plaintiff's cell phone is a residential number

112.     The calls were to Plaintiff's cellular phone 3822 which is Plaintiff's personal cell phone

that he uses for personal, family, and household use. Plaintiff also uses his cell phone for

navigation purposes, sending and receiving emails, timing food when cooking, and sending and

receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays

the cell phone from his personal accounts, and the phone is not primarily used for any business

purpose.

## CAUSES OF ACTION:

## COUNT ONE:
### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

113.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the

preceding paragraphs.

114.     Defendant and/or their affiliates or agents violated the TCPA, 47 U.S.C. §

227(b)(1)(A)(iii), at least fourteen (14) times by placing non-emergency telemarketing calls to

Plaintiff's cellular telephone number using an automatic telephone dialing system without prior

express written consent.

115.     Plaintiff was statutorily damaged at least fourteen (14) times under 47 U.S.C. §

227(b)(3)(B) by Defendant by the telephone calls described above, in the amount of $500.00 per

call.

18

116.    Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

117.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendant and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls to any cellular telephone number using an ATDS without prior express written consent.

## COUNT TWO:
### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

118.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.    Defendant called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

120.    Plaintiff was statutorily damaged at least sixteen (16) times under 47 U.S.C. § 227(c)(3)(F) by Defendant by the telemarketing calls described above, in the amount of $500.00 per call.

19

121.    Plaintiff was further statutorily damaged because Defendant willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

122.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:
### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

123.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

124.    The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

   a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];

   b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

   c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

125.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

---

[2]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[3]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[4]*Seeid.* at 425 (codifying a June 26, 2003 FCC order

126    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or

willful violation. 47 U.S.C. § 227(c)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against the Defendant

severally as follows:

A. Leave to amend this Complaint to name additional DOESs as they are identified and to

conform to the evidence presented at trial;

B. A declaration that actions complained of herein by Defendant violate the TCPA law;

C. An award of $1500 per call in statutory damages arising from the TCPA §227(b)

intentional violations jointly and severally against the corporation for 14 calls.

D. An award of $1500 per call in statutory damages arising from the TCPA §227(c)

intentional violations jointly and severally against the corporations for 16 calls.

E. An award to Plaintiff of damages, as allowed by law under the TCPA;

F. An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and equity.

G. Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

November 11, 2022,                                    Respectfully submitted,

Joshua Cacho
Plaintiff, Pro Se
164 Estella Road
Lake Mary, Florida 32746
407-577-3822
jcacho1848@gmail.com